## LYNCH v. UNITED STATES et al.

District Court, S. D. New York.
June 28, 1947.

Saul Nemser, of Jersey City, N. J. (Nathan Baker, of Hoboken, N. J., of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (C. B. M. O'Kelley, of New York City, of counsel), for respondent United States.

Duncan & Mount, of New York City (Frank A. Bull and Daniel Huttenbrauck, both of New York City, of counsel), for respondent-impleaded.

HULBERT, District Judge.

This suit is brought under the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752.

The libellant is a citizen and resident of the State of New Jersey and is the widow of James F. Lynch, to whom she was married on May 13, 1943, and was appointed administratrix of his estate by the Surrogate of the County of Hudson, State of New Jersey on October 4, 1944.

Her intestate, who was 47 years of age at the time of his death, had been previously married and five children born of that union survive, of the approximate ages of 9, 10, 12, 17 and 18 years, respectively.

Lynch had a full time job as a laborer (utility man) and worked from 9 A.M. to 4 P.M. six days per week, for which he received the sum of $200 per month. He was also employed by the Bethlehem Steel Company, a Pennsylvania corporation having an office in this District, as an electrician's helper on a night shift.

The United States of America owned the steamship "Ben F. Dixon," a cargo carrying vessel which was operated by the War Shipping Administration, a corporation created by Act of Congress, and owned by the United States Government.

On or about the 10th day of August, 1944, the War Shipping Administration entered into an agreement in writing with the Bethlehem Steel Company wherein and whereby the latter agreed to furnish all necessary labor and material and/or equipment to undertake and complete repairs to said vessel, which for that purpose was placed in drydock.

The libellant's intestate was one of the persons employed by the Bethlehem Steel Company and was a member of a gang engaged in the performance of some electrical work in the gun crew quarters on the main deck, aft of No. 5 hold.

On the morning of August 15, 1944, the vessel was taken off drydock and towed down and across the North River and berthed on the south side of Pier No. 2, bow in, so that her portside was made fast to the dock.

Lynch and his fellow workers reported for duty in Hoboken at 7 p. m. that evening and were transported to Pier No. 2 where they arrived about 10 o'clock, reported to the boss and immediately turned to in the gun crew quarters.

Meanwhile Johnson, employed by Bethlehem as temporary light man, left the yard at 7 p. m., proceeded to the pier, boarded the vessel and put up three 200 watt temporary cage lights, one on the skid after girder about midway between the No. 4

and No. 5 hatches; one on the after rail just forward of the gun mount and one just back of the gangway, all on the portside, in addition to which, he hung a cage light on the No. 5 winch, as the machinist had told him they would be working on that winch, and there was a cargo light on the ship throwing down on the gangway from the pier.

Johnson sat at the gangway near No. 4 hatch, on that hatch, with Robertson, a watchman, but he made periodical inspection tours about every half hour to see that all lights were burning properly.

It is the claim of the libellant there was a light on the boom rest aft of No. 5 hatch which one of several men lying on the cover of said hatch, removed and threw over the rail on top of the gun crew quarters. Johnson did not put up this light and did not see it there before the accident, but testified that it was put there afterward to enable the doctor, who had been summoned, to go down into the hatch.

About 11 p. m. the men in the gun crew quarters, including libellant's intestate, knocked off to go to supper and Reynolds, for whom Lynch acted as a helper, testified the men came out of the gun crew quarters on the starboard side, which was dark, and crossed the No. 5 hatch to the portside to reach the gangway to the pier. The hatch combing was about 2½ feet to 3 feet high. There was a life raft on the forward part of the hatch cover and several men were lying there asleep.

There is evidence that at least two other employees had gained access to the No. 5 hold in the afternoon for the purpose of making some repairs and that one of the hatch boards about 2½ or 3 feet wide and 5 feet long had been removed, but the Chief Officer testified that it had not been removed by any of his crew, and the court feels that it may be reasonably inferred that it was not off when the ship was turned over to the Bethlehem Steel Company but it necessarily had to be removed when their employees entered the hold in the performance of their duty under the contract.

Reynolds discovered this board was off when he returned from lunch. There is no proof however that it came to the attention of the libellant's intestate. All of the employees of the Bethlehem Steel Company working in the gun crew quarters returned safely after supper and knocked off again about 3 o'clock to go ashore for a drink of water as they had been warned not to drink the ship's water. On this occasion Reynolds came out of the gun crew quarters on the starboard side, crossed to the portside along a passage way between the after part of the No. 5 hatch and the gun crew quarters; he could have come out from the gun crew quarters through the door to the portside or he could have crossed aft of the gun crew quarters.

William Soderling, the electric "snapper" or foreman, about half an hour before the accident, saw the center cover of the No. 5 hatch aft end, 2 feet by 4 or 5 feet long, off, and two or three men sleeping on the hatch cover. He testified there was adequate light on the portside that night and there was a light on the gun mount portside about 10 feet aft of the port corner of the after combing of No. 5 hatch.

Frank Riley Brunton, an electrician employed by Bethlehem Steel Company in the gunnery quarters, did not notice that one of the boards of the hatch cover was off until after libellant's intestate had fallen, although he crossed over that hatch diagonally from starboard to port going to supper at 11 o'clock.

Apparently Lynch again chose to proceed across the No. 5 hatch cover about 3 o'clock A.M.

Reynolds heard someone call out that a man had fallen through the hatchway. He and another unidentified person entered the hatchway, electric lights were dropped down and a doctor summoned, and the body of Lynch was found and he died soon thereafter.

The testimony adduced is rather skimpy and leaves much to speculation, but one thing is certain, namely—the Bethlehem Steel Company provided an adequately lighted passageway on the portside of the vessel which was nearest to the dock. The

libellant's intestate chose another way, which was dark and encumbered by the raft and persons resting or sleeping on the hatch cover.

The court is satisfied that the accident occurred, not through the fault of the Bethlehem Steel Company, but the unfortunate choice by the libellant's intestate of an unsafe means of egress rather than the lighted passageway provided by his employer and of which he had knowledge. Hardie v. New York Harbor Dry Dock Corporation, 2 Cir., 9 F.2d 545.

The libel must be dismissed.